# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**TERRY JONES,**

    **Plaintiff,**

v.                                  Civil Action No. 2:11-cv-94

**UNITED STATES OF AMERICA,**

    **Defendant.**

# REPORT AND RECOMMENDATION

## I. PROCEDURAL HISTORY

On June 23, 2011, the plaintiff, Terry Jones, by counsel, filed this action under the Federal Tort Claims Act ("FTCA") in the United States District Court for the District of Columbia, and on June 27, 2011, the plaintiff filed his first amended complaint. On November 11, 2011, the case was transferred to the United States District Court for the Northern District of West Virginia. The United States of America filed a Motion for Partial Dismissal, a memorandum in support of the motion, and an answer to the plaintiff's first amended complaint all on January 19, 2012. The plaintiff's response in opposition to the motion was filed on February 6, 2012.

## II. CLAIMS PRESENTED

**A. The Complaint**

There appears to be no dispute that the plaintiff is a D.C. offender, who is in the custody of the Federal Bureau of Prisons ["BOP"] pursuant to the National Capital Revitalization and Government Self Improvement Act of 1997, Pub. L. No. 105-33, 111 Stat. 251, 712-97 (1997).

1

Although it is unclear when he was transferred to the custody of the BOP, the plaintiff alleges, and the defendant does not dispute, that in December of 2007, he was housed at USP Hazelton, which is located in Bruceton Mills, West Virginia. There also appears to be no dispute that the plaintiff was housed in the B-2 Pod of Unit B during December of 2007.

During portions of 2007, Duane Evans, who is apparently from Baltimore, Maryland, was also housed in the B-2 pod. However, the plaintiff asserts that Evans was removed from the B-2 pod for a period of disciplinary segregation sometime prior to December 20, 2007. During his absence from the Unit, a pair of his shoes allegedly went missing. On or about December 20, 2007, Evans returned to the B-2 pod and , according to the plaintiff, told an inmate from Washington, D.C. that he (Evans) would kill whoever had taken his shoes. According to the plaintiff's complaint, there was a "lot of talk" between the Washington, DC and Baltimore inmates because Evans suspected it was a DC inmate who had taken his shoes.

The plaintiff claims that on or about December 20, 2007, he was in the B-2 pod for the 4:00 p.m. inmate count. The plaintiff alleges that Evans returned to the B-2 pod just prior to the commencement of the 4:00 p.m. count, but after the prescribed time by which inmates had to be back in their pods. According to the plaintiff, Evans rang the "doorbell" outside of the B-2 pod, and the Unit Manager, D. LeMaster, opened the door for Evans. According to the plaintiff, before LeMaster could close the door, Evans motioned for two other inmates, not assigned to the pod, to follow him. As these two additional inmates entered the pod, LeMaster yelled out "they've got knives." According to the plaintiff, LeMaster then "ran and hid" from the armed inmates.

The plaintiff alleges that upon entering the pod, Evans and the other two inmates produced knifes and began attacking inmates. Although the plaintiff does not alleges that he was a target of

2

Evans or the other inmates, he does allege that one of the armed inmates began chasing him in an effort to stab him. According to the plaintiff, he then slipped in a "pool of blood" while running from the armed inmate and fell, hitting his neck and back on the metal stairwell and injuring his left knee.

The plaintiff alleges that after his fall, he began experiencing numbing, tingling, and burning sensations in his right hand. The plaintiff asserts that while at the prison's Health Services center on December 26, 2007, the nurse could not find any abnormalities or injuries which were causing his symptoms, and instead, attributed them to pain due to a possible pinched nerve from an "old back injury." The nurse allegedly told him to "stop sit-ups" and follow up if the pain continued. The plaintiff further alleges that on approximately March 7, 2008, Physician's Assistant Patricia Corbin saw him and noted his complaint of a "pinched nerve" in his back and "nerve pain in r[ight] arm with tingling in 3-5th fingers." However, she did not prescribe follow-up treatment for his back and extremity pain, but instead, prescribed medication and follow-up exclusively related to his hypertension. The plaintiff continues by alleging that on approximately March 23, 2008, he was seen in an unscheduled appointment by an unidentified Medical Doctor who accused him of "possible narcotic ingestion" and subjected him to a dry cell for observation. PA Corbin saw him again on April 7, 2008, and prescribed 15 days of pain relievers and anti-inflammatory drugs, but denied him the MRI he requested. On April 9, 2008, the plaintiff had x-rays taken which showed that he had "degenerative join disease/disc disease." The plaintiff maintains he was given no treatment for his disease or a follow-up appointment to discuss the results. The plaintiff's also alleges that his formal and informal requests were generally ignored until about July 10, 2008. Around this time, he alleges he was seen by a Mid-Level Practitioner for unscheduled urgent care regarding his leg and back, but

3

was prescribed only a ten-day course of ibuprofen and was told to increase his fluid intake.

On or about October 31, 2008, the plaintiff submitted a Request for Administrative Remedy to a staff member at Main Line and received a written response that he would be seen by Dr. Alacron on November 3, 2008. The plaintiff alleges that during his appointment with Dr. Alacron, he was treated only for high blood pressure, despite his primary complaint being loss of movement in his legs and feet. However, the plaintiff alleges that Dr. Alacron scheduled an orthopedic consult for the following day, but the plaintiff claims that he never saw an orthopedic specialist at USP Hazelton. More specifically, the plaintiff notes that on the day that the orthopedic consult was scheduled, November 4, 2008, he was transferred from USP Hazelton. During his transfer from USP Hazelton, the plaintiff's maintains that his medical condition was worsened. In particular, the plaintiff notes that after his transport to FTC Oklahoma City by plane, he was transported to USP Tucson by bus. The bus ride took approximately seventeen hours, and due to the uncomfortable positioning and inability to move, stand, or place himself in a new position, he was unable to walk off the bus on his own accord upon arrival at USP Tucson.

While at USP Tucson, the plaintiff alleges he requested a wheelchair. This request was denied, and no treatment was provided or even a note taken regarding his back and extremity pain or his loss of movement. Over the next eighteen weeks at USP Tucson, the plaintiff maintains that he made multiple formal and informal requests for further medical treatment. On or about November 24, 2008, the Plaintiff notes that he reported for unscheduled urgent care treatment and was seen by Dr. Smith, D.O.. Dr. Smith requested an orthopedic consultation on February 24, 2009, but the facility's Utilization Committee later disapproved the appointment, despite their prior approval.

4

The Plaintiff saw various physicians and nurses in the following months at USP Tucson, but no treatment was given for the medical condition that was his major concern. On or about March 11, 2009, he collapsed onto the ground in the recreation yard and was unable to move. He was transported to St. Mary's Hospital where he underwent testing and an MRI, showing that he was suffering from extensive spinal damage, including severe spinal stenosis, degeneration of the spinal discs, and disc protrusion. He underwent surgery, but the plaintiff maintains that the damage was irreversible due to the length of time between onset and surgery.

The plaintiff claims that he continues to experience pain, numbness, stiffness, and muscle atrophy throughout his body, as well as limited mobility. He uses a walker to stabilize himself and to walk, and suffers mental repercussions from enduring more than fourteen months of these symptoms without treatment for his condition. He further claims that he will no longer be able to work in the manual labor jobs to which he is accustomed.

The plaintiff's complaint alleges negligence (failure to protect), medical malpractice at both USP Hazelton and USP Tucson, and negligence (during transport to Arizona). The plaintiff requests compensatory damages, economic damages, costs of the suit, including attorney's fees, and such other and further relief as the Court deems just and proper.

**B. The Defendant's Motion**

In the memorandum in support of its motion for partial dismissal, the defendant argues that Count I[1] of the plaintiff's Complaint should be dismissed for failure to state a claim upon which

---

[1] Specifically, Count I alleges that: (a) prison officials have a duty to protect inmates from harm caused by other inmates; (b) prison staff officials knew or show have known that the plaintiff faced a risk to his health and safety from attack from other inmates; (c) prison staff and officials knew or should have known that allowing inmates into a housing unit when they were not authorized to be there created an excessive risk to the plaintiff's safety; (d) prison officials

relief can be granted. In support of that argument, the defendant asserts:

    (A)    The discretionary function exception to the waiver of sovereign immunity under the FTCA precludes the plaintiff's failure to protect claim (Count I), and

    (B)    The plaintiff's failure to protect claim must be dismissed pursuant to Rule 12(b)(6) because no agent of the United States was the proximate cause of Plaintiff's alleged injuries.

## C. The Plaintiff's Response

In his reply, the plaintiff argues that he has stated a claim for which relief can be granted. In support of that argument, the plaintiff argues:

    (A)    The discretionary function exception to the FTCA is inapplicable.

    (B)    Plaintiff has sufficiently alleged that the defendant was the proximate cause of his injuries.

## III. STANDARD OF REVIEW

### A. Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the

---

breached their duty to protect the plaintiff from harm by failing to take any actions to protect him from these risks to his safety; and (e) as a result of these actions and inactions by prison staff and officials, the plaintiff suffered serious personal injuries, pain and suffering, loss of life's pleasures, and emotional distress.

complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," Id. (citations omitted), to one that is "plausible on its face," Id. at 570, rather than merely "conceivable." (Id). Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order

7

to meet the plausibility standard and survive dismissal for failure to state a claim. (Id).

### IV. ANALYSIS

**A. Count 1**

The Federal Tort Claims Act (FTCA) is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of negligent acts of agents of the United States. The United States cannot be sued in a tort action unless it is clear that Congress has waived the government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. § 1346(b), § 1402(b), § 2401(b), and §§ 2671-2680.

Pursuant to the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 2674 & 1346(b)(1); Medina v. United States, 259 F.23d 220, 223 (4th Cir. 2001). In West Virginia, in every action for damages resulting from injuries to the plaintiff alleged to have been inflicted by the negligence of the defendant, the plaintiff must establish three elements: (1) a duty which the defendant owes to him; (2) a negligent breach of that duty; and (3) injuries received thereby, resulting proximately from the breach of that duty. Webb v. Brown & Williamson Tobacco Co., 2 S.E.2d 898, 899 (W.Va. 1939). The burden is on the plaintiff to prove these elements by a preponderance of the evidence. Id. at 899; see also Murray v. United States, 215 F.3d 460, 463 (4th Cir. 2000). Therefore, the plaintiff must prove that the "defendant's breach of duty was more likely than not the cause of the injury." Murray at 463 (quoting Hurley v. United States, 923 F.2d 1091, 1094 (4th Cir. 1991); see also Strahin v. Cleavenger, 603 S.E.2d 197 (W.Va. 2004)(stating that "no action for negligence will lie without a

duty broken."). The United States, it appears, acknowledges that it owes a "duty" to keep prisoners safe and free from harm. However, it argues that the Plaintiff has failed to establish that it breached that duty and/or that it was the proximate cause of his injuries.

The FTCA includes specific, enumerated exceptions in 28 U.S.C. § 2680. If an exception applies, the United States may not be sued, and litigation based upon an exempt claim is at an end. Smith v. United States, 507 U.S. 197 (1993); Dalehite, supra. Among the exceptions to the FTCA most frequently applied is the "discretionary function". The discretionary function exception precludes governmental liability for"[a]ny claim based upon ... the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984). Congress believed that imposing liability on the government for its employees' discretionary acts "would seriously handicap efficient governmental operations." Id. at 814 (internal citations and quotations omitted).

The United States Supreme Court has announced a two-step test for determining whether the discretionary function exception bars suit against the United States in a given case. First, the Court must consider the nature of the conduct and determine whether it involves "an element of judgment or choice." United States v. Gaubert, 499 U.S. 315, 322 (1991). Government conduct does not involve an element of judgment or choice and is not discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." Id. at 322 (internal citations and quotations omitted).

If the conduct in question involves the exercise of judgment or choice, the second step of the analysis is to determine whether that judgment is grounded in considerations of public policy. "[T]he purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 323.

With respect to federal prisoners, the Supreme Court has determined that the duty of care owed by the BOP is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule. United States v. Munitz, 534 F.2d 53, 53 (1963). 18 U.S.C. § 4042 defines the duty of care owed to a prisoner as " the exercise of ordinary diligence to keep prisoners safe and free from harm." Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976). However, the BOP's duty towards the protection of prisoners is not the guarantee of "a risk-free environment." See Usher v. United States, 2010 WL 3721385 (E.D. Ky. Sept. 15, 2010).

In West Virginia, negligence is "always determined by assessing whether the actor exercised 'reasonable care' under the facts and circumstance of the case, with reasonable care being that level of care a person of ordinary prudence would take in like circumstances." Strahin v. Cleavenger, 603 S.E.2d 197, 205 (W.Va. 2004). "A long standing premise of the law of [West Virginia] is that negligence is the violation of the duty of care under the given circumstances. It is not absolute, but is always relative to some circumstances of time, place manner, or person." Setser v. Browning, 590 S.E.2d 697, 701 (W.Va. 2003). Accordingly, the duty of care owed to an inmate under West Virginia law is consistent with 8 U.S.C. § 4042.

Although 18 U.S.C. § 4042 sets forth the mandatory duty of care, it does not direct how the duty is fulfilled. See Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997)) finding the statute "sets forth no particular conduct that the BOP personnel should engage in or avoid while

10

fulfilling their duty to protect inmates."). However, under the FTCA, in disputes between prisoners, it is clear that BOP employees could be negligent in their duty to protect prisoners if they "knew or reasonably should have known of a potential problem" between inmates. Parrott v. United States, 536 F.3d 629, 637 (7th Cir. 2008).

The United States contends that it cannot be liable for the plaintiff's injuries because the plaintiff did not advise USP Hazelton staff of a problem between him and the inmates, nor does the plaintiff allege that any prison officials were aware of such a problem. The undersigned does not believe that liability in this case is dependent upon whether members of Hazelton staff received an actual or particularized notice of danger to the plaintiff. The plaintiff is not alleging a constitutional tort requiring him to show deliberate indifference and, therefore, actual notice of the danger to him. Because the FTCA renders the United States liable for negligently failing to protect a prisoner, negligence, in the opinion of the undersigned, includes failure to respond to a risk which a reasonable person would have known, whether or not he or she was actually apprised of it. See Farmer v. Brennan, 511 U.S. 825, 847 (1994)(an 8th Amendment claim for deliberate indifference requires actual notice); Del Raine v. Williford, 32 F.3d 1024, 1032 (7th Cir. 1994)(comparing constitutional and negligence standards).

In Count 1, the plaintiff contends that his unit CO negligently allowed inmates to enter a unit to which they were not assigned, thereby failing to protect him from reasonably foreseeable harm. In response, the United States maintains that the plaintiff has not cited any mandatory directives that prescribe a course of action for the circumstances of the incident. However, the plaintiff does cite the Correctional Services Procedures Manual in his Opposition to the Defendant's Motion for Partial Dismissal, as well as other directives within his complaint though not by their official citations.

Plaintiff's argument in defense of his lack of citations of mandatory policy is that most of these mandatory directives are in possession of the government and are unavailable in the absence of discovery.

The United States also argues that the plaintiff has failed to present evidence that it was the proximate cause of his injuries. As previously noted, under the FTCA, the law of the state where the alleged negligence occurred controls the analysis. 28 U.S.C. § 2674; Miller v. United States, 932 F.2d 301, 303 (4th Cir. 1991)("State law determines if there is an underlying cause of action"). "West Virginia law defines a proximate cause of an injury as one 'which, in natural and continuous sequence, produces foreseeable injury and without which the injury would not have occurred. Thus, the test requires both (1) foreseeable injury; and (2) but-for causation." Grant Thornton, LLP v. Federal Deposit Ins. Corp., 435 Fed.Appx. 188, 194 (4th Cir. 2014)(internal quotations and citation omitted); Aikens *v.* Debow, 541 S.E.2d 576, 581 (W.Va. 2000)("To be actionable, negligence must be the proximate cause of the injury complained of and must be such as might have reasonably expected to produce an injury.")(internal citation omitted).

The plaintiff alleges that the unit CO was the proximate cause of his injuries. More specifically, he alleges that had the CO not negligently allowed the other inmates into his unit, there would have been no brawl and therefore the plaintiff would not have been injured while running from it.

The United States argues that in a negligence action, any "willful, malicious, or criminal act breaks the chain of causation." Yourtee v. Hubbard, 474 S.E.2d 613, 620 (W.Va. 1996). The United States maintains there exist additional intervening causes – the willful and malicious striking and stabbing by the other inmates resulting in the pool of blood in which the plaintiff slipped.

12

However, Yourtee actually holds that such acts do not necessarily break the chain of causation:

> A tortfeasor whose negligence is a substantial factor in bringing about injuries is not relieved from liability by the intervening acts of third persons if those acts were reasonably foreseeable by the original tortfeasor at the time of his negligent conduct.[2]

Again, it is not clearly unforeseeable that inmates armed with knives, or inmates in units to which they are not assigned, would have the intentions of harming another inmate. Therefore, if the CO was negligent in performing his duties, thus allowing the other inmates to enter the Unit with knives and, further failed to stop the confrontation when the inmates began brawling, the actions of the inmates would not relieve him from his liability for the plaintiff's injuries.

In summary, the plaintiff has filed a complaint which alleges that his Unit CO was negligent in the performance of his duty station, and that said negligence was the proximate cause of his injuries. In addition, there is little dispute that the plaintiff suffered serious injuries on or about December 20, 2007, and those injuries were the result of a confrontation with other inmates who were clearly not in their assigned Unit. Accordingly, Count 1 of the complaint, viewed in the light most favorable to the plaintiff, is sufficient to survive the defendant's motion to dismiss. It gives the defendant fair notice of his claims, and the grounds upon which it rests.

## V. RECOMMENDATION

In consideration of the foregoing, it is the undersigned's recommendation that the defendant's Motion for Partial Dismissal (ECF No. 30) be **DENIED**, and that a Scheduling Order be entered.

Within fourteen (14) days after being served with a copy of this report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the

---

[2] Yourtee at 621.

recommendation to which objection is made and the basis for such objections.  A copy of any objections should also be submitted to the Honorable John Preston Bailey, United States District Judge.  Failure to timely file objections to this recommendation will result in waiver of hte right to appeal from a judgment of this Court based upon such recommendation.  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record via electronic means.

**DATED:** July 31, 2012

_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE