**IN THE UNITED STATES DISTRICT COURT**
**FOR HE NORTHERN DISTRICT OF WEST VIRGINIA**
**Elkins**


**TERRY JONES**,

               Plaintiff,

      v.                                   **Civil Action No. 2:11-CV-94**
                                                 Judge Bailey

**UNITED STATES OF AMERICA**,

               Defendant.


**FINDINGS OF FACT, CONCLUSIONS**
**OF LAW AND MEMORANDUM ORDER**

      This is an action brought by plaintiff Terry Jones pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680.   The First Amended Complaint ("Complaint") [Doc. 2], filed with the Court on June 27, 2011, stated four causes of action. Count I, styled as Negligence (Failure to Protect), alleged that staff at USP Hazelton in Bruceton Mills, West Virginia negligently failed to protect plaintiff from harm which occurred while he was fleeing an inmate fight within his housing unit.   Counts II and III alleged medical malpractice against health care providers at Bureau of Prisons ("BOP") institutions USP Hazelton and USP Tucson, respectively.   Count IV alleged negligence and mistreatment of Plaintiff by BOP staff during Jones's transport from USP Hazelton to USP Tucson.

      On July 31, 2013, the parties jointly entered a stipulation dismissing Count IV from the case [Doc. 123].

On January 14–15, 2014, the parties appeared before this court for a bench trial as to the three remaining counts.  The plaintiff was represented by Andrew R. Sommer, Brian M. Serafin, Eric M. Goldstein, Kimberly L. Paschall, and William D. Wilmoth.  The Government was represented by Erin K. Reisenweber, Alan G. McGonigal, and Diana Jacobs Lee.  This Court received testimony from the plaintiff, Dr. Gregory Przybylski, Dr. Gregory Rosencrance, Nancy Bond, Robert Jackson (by video), Dr. Jack Wilberger, Dr. Inerio Alarcon (by video), Patricia Corbin, Anndreea Shorter, William Holzapfel, Jr., Jason Shaw, Erik Smith, and Hiromichi Kobayashi, and reviewed the deposition testimony of Michael Lynch, David LeMaster, Joseph Micieli, and Dr. Rasim Oz.

Having heard and reviewed the testimony and evidence presented by the parties and having reviewed the briefing submitted by the parties, this Court hereby makes the following findings of fact and conclusions of law:

### Findings of Fact

1.     As of December 2007, Mr. Jones was incarcerated at USP Hazelton in Bruceton Mills, West Virginia.  Mr. Jones was assigned to live in the B-2 housing unit.

2.     As of December 2007, Donte Evans, an inmate from Baltimore, Maryland, was incarcerated at USP Hazelton in Bruceton Mills, West Virginia.  Evans was assigned to live in the B-2 housing unit.

3.     During December 2007, Donte Evans was placed in USP Hazelton's Special Housing Unit (solitary confinement, the "SHU") for possession of a knife.  Evans was released from the SHU on December 20, 2007, and was returned to the general population in the B-2 housing unit.

4.     While Evans was in the SHU, his shoes went missing.  Although Evans

2

suspected that a Washington, D.C. inmate had stolen them, it was later discovered that BOP staff had misplaced them.

5.      After accusing several D.C. inmates of taking his shoes, Evans recruited two other Baltimore inmates and orchestrated an attack against D.C. inmates in the B-2 housing unit, using homemade weapons.

6.      The attack occurred as the inmates housed in B-2 unit were preparing for the 4:00 p.m. "stand-up count," a daily, prison-wide procedure during which every inmate is required to return to his housing unit, enter his cell, and stand by his bed so that USP Hazelton employees can account for the whereabouts of all inmates in the facility.

7.      At USP Hazelton, preparation for the 4:00 p.m. count begins at approximately 3:50 p.m.  At that time, the officer on duty in each housing unit will verbally announce that it is time for count; the inmates then make their way into their cells.  The officer on duty then manually locks all inmates into their cells, a process that takes approximately ten to fifteen minutes.  After all cell doors are locked, "the official stand-up count" begins.

8.      While it is rare for the BOP to receive warning of an attack, the BOP received such a warning in this case.

9.      On December 21, 2007, at approximately 3:40 p.m., Anndreea Shorter, Unit Secretary for Hazelton's "Bravo" (B-1 and B-2) housing units, was in her office off of the secure hallway dividing those two units.   As she was posting callouts (inmate appointments), Shorter heard an unidentified inmate knocking at the door between the hallway and the B-1 unit.  Shorter first posted callouts in the B-2 unit, and when she returned to the hallway, the inmate was gone.

10.     The inmate had, however, left a note, which Shorter read at 3:41 p.m.  The

3

note stated:

> Ms. Shorter, give this to SIS or the LT[1] ASAP.  Donte Evans in B2 that just got caught with a knife has another one.  He is about to start a DC Baltimore beef so you need to get him off the compound ASAP.  He is beefing with a dude in his block.  They tried to stop him but he don't listen to nobody.

11.    Under the BOP Standards of Employee Conduct, "it is mandatory that employees respond immediately and effectively to all emergency situations."  As Shorter admitted, BOP employees do not have discretion to ignore this provision.  This mandate is grounded in the reality that "failure to respond to an emergency situation may jeopardize the security of the institution, as well as the lives of staff or inmates[.]"

12.    As Shorter also admitted, an inmate with a knife is an emergency situation, "something [BOP staff] would act on right away."  The warning note "definitely" should have caused concern for the safety and security of the institution.

13.    Shorter testified that, after reading the note, she first attempted unsuccessfully to contact the SIS office by phone.  She testified that she then reached out by radio, seeking SIS's phone extension.  Upon receiving that information, Shorter testified that she phoned SIS and read the warning note word-for-word to an unidentified individual whom she believed was with the SIS department.

14.    Shorter did not use the radio because the transmission would be overheard by inmates in proximity to guards.

15.    Shorter does not recall who answered the phone.  None of the staff members working in, or with access to, the SIS office at the time of Shorter's alleged call had any

---

[1] Special Investigative Services, or SIS, acts as the prison's internal affairs, responsible for, among other things, investigating offenses committed by inmates.  LT refers to Lieutenant.

recollection or knowledge of Shorter calling SIS about the note.  Nor does the official BOP report regarding the attack mention Shorter's alleged call to the SIS offices, or that she ever told anyone about the warning note.  Even Shorter's own contemporaneous statement regarding the incident fails to mention this alleged call to SIS, or even to describe the note.

16.     According to Shorter, she was instructed to hand-carry the note to the SIS office, even though that office was an eighth of a mile away, and the walk would have taken about 15 minutes at that time of day.

17.     At trial, two SIS staff members testified that their response to having been read the warning note would have been immediately to call the Lieutenant on shift and/or have Evans separated from the other inmates for questioning.  No one in SIS took any such action.

18.     Members of the SIS staff testified that they would have wanted to see the note in person and that they did not know whether the note was credible.

19.     The receipt of "drop notes" is not uncommon, and the notes are sometimes used to cause unwarranted trouble for other inmates or to provide a distraction or misdirection for other nefarious activities.

20.     SIS officers stated that they would have pulled Evans in for questioning.  With the 4:00 count imminent and not knowing exactly where Evans was at that point in time, however, the officers stated that they would have waited until Evans was in his cell for count in order to bring him in for questioning.

21.     To get to the SIS office, Shorter had to walk through the B-1 housing unit. While she was doing so, an inmate told her that it was "too late," which she understood to mean that the attack was starting "now."  As she continued to walk away from the B-2 unit

5

and toward the SIS offices, the body alarm sounded, indicating that the attack was underway.

22.     Shorter admitted that the actions she took were not "effective" in preventing the violence.  Nor were those of the identified person who took her call.

23.     While Shorter was carrying the warning note to the SIS office, Evans rang the buzzer at the B-2 unit door for someone to unlock the door.  Unit Manager David LeMaster answered the door.

24.     LeMaster was not aware of impending danger, and admitted that "[i]f I kn[e]w Donte Evans was going to assault anybody, I would have notified our operations lieutenant and/or the captain, if necessary.  And then I would've—if I kn[e]w Donte Evans was going to do what he did, I would never have opened up the door."

25.     At 3:52 p.m., when LeMaster unlocked and opened the door, Evans and two other Baltimore inmates pushed past him into B-2, and began stabbing other inmates—particularly those whom Evans identified as being from Washington, D.C.  It was "chaos."

26.     When the attack began, Jones was standing on the top tier (second level) of B-2.  Jones saw Evans and two other inmates enter the unit with knives.  Evans ran up one of the two sets of stairs to the top tier and headed toward Jones, who ran from him.

27.     As Jones reached a set of stairs leading back down to the main level, he slipped and fell on blood from one of the inmates who had been stabbed.  Jones struck his neck and back on the metal staircase.

28.     When a patient complains of pain and neurological symptoms such as numbness, tingling, weakness, and gait and limb impairment, as Jones did here, the

6

standard of care requires a complete medical history and a full neurological exam:

> [Y]ou have to get an accurate history, a thorough history. You listen to what the patient tells you, but then you have to ask a sequence of questions, a series of questions, to try to determine what it is that's going on in your mind so that you have a full understanding, and then you have to obtain a physical examination. It needs to be a thorough examination, but it also can be focused on the areas in question. If you're complaining of right arm pain, it ought to focus on the right arm, both the neurologic piece, as well as the musculoskeletal. If it's focused on the low back and lower extremity, it ought to focus there.

29.     Further, when a patient presents with pain and neurological symptoms, the standard of care allows for only 8–12 weeks of "conservative management" of the condition before imaging studies, such as an MRI, are required. The standard of care requires further evaluation of symptoms after an 8–12 week period of conservative management. The standard of care is to treat conservatively, then refer for an MRI, as opposed to an X-ray, for persistent pain that doesn't resolve despite conservative measures such as physical therapy and medication.

30.     If a physician reasonably refers a patient for a consult with a specialist, the standard of care requires follow-through to ensure that the patient receives that consult. Dr. Wilberger, the Government's own expert, admitted that "[i]f there wasn't follow-through [on a consult referral], I would be very concerned about that[.]" Tr. 428:1-2.[2]

31.     Before December 21, 2007, Jones engaged in normal physical activities, including walking, running, using the gym, playing sports such as basketball, and taking his son to the park. Jones's May 2, 2006 USP Hazelton intake screening noted no pain or

---

[2] At trial, Dr. Wilberger admitted that it was his understanding that an orthopedic surgeon actually saw Jones as a result of BOP's recommendation. The record is undisputed that Dr. Wilberger's understanding was wrong.

disabilities, though Jones did have hypertension (high blood pressure).

32.     When he fell on December 21, 2007, Jones likely had preexisting cervical spondylosis with stenosis.

33.     Cervical spondylosis involves narrowing of the spinal canal and normally progresses slowly over time.  It may remain asymptomatic, but can turn into cervical myelopathy as a proximate result of a physically traumatic event—such as the fall that Jones suffered on December 21, 2007.

34.     Cervical myelopathy is a condition where the spinal canal narrows to the point of compressing the spinal cord and damaging the interior nerves.  It can cause symptoms such as pain, numbness, tingling sensation in the extremities, weakness, and gait and limb impairment.

35.     Cervical myelopathy may not present immediately when someone with stenosis, such as Jones, suffers a traumatic fall; instead, the swelling that causes myelopathy may take days to manifest, similar to why, when you have a great workout, you feel okay that day, but maybe the next day you start to hurt.  This delay is not atypical and a five-day delay before symptoms manifest is not unreasonable.

36.     Due to the chronic nature of the condition, it is common for a patient suffering from cervical myelopathy, such as Jones, not to complain about his neurological symptoms at each clinical encounter.

37.     It is quite common for the medical record of a patient suffering from progressive myelopathic symptoms, such as Jones, to reflect gaps between periods of complaints.  This is because the progression of myelopathy related to spondylosis is not typically rapid, and typically occurs over months to a year or years.

38.     As Dr. Przybylski testified, to a reasonable degree of medical certainty, Jones's fall on December 21, 2007, triggered his cervical myelopathy.

39.     On December 26, 2007—five days after he fell and while the prison was on lockdown—Jones triggered an emergency alarm in his cell and ultimately presented to BOP medical services complaining of numbness and burning in the third and fourth fingers of his right hand.

40.     Numbness and burning in the third and fourth fingers of the right hand can indicate a spinal cord problem.

41.     At the time of the December 26, 2007 visit, the standard of care required BOP medical staff to obtain a full medical history, including asking questions such as "when did the symptoms start, how have they evolved, are other areas of the body affected, what makes those symptoms worse or better."  The standard of care also required a neurologic examination referable to Jones's neurological symptoms.  That examination would include testing the muscle strength in the upper limbs as well as the lower limbs, looking for muscular atrophy, examining the sensation of the upper limbs as well as lower limbs, watching the gait or ambulation of the patient, and checking the patient's dexterity as part of what the standard of care requires in evaluating an acute neurologic symptom.

42.     BOP medical staff's treatment of Jones fell below the standard of care by obtaining only a very brief history, and by conducting a substandard examination, resulting in a diagnosis of a pinched nerve and an instruction to stop doing sit-ups.

43.     On March 7, 2008, Jones complained of a pinched nerve, nerve pain in his right arm, and tingling in his third through fifth fingers.  These complaints represented a progression from what was described in the December 26th, 2007 visit.  In other words,

Jones's symptoms were getting worse.

44.     The involvement of the fifth finger on the right hand represents a broader distribution of symptoms, making a spinal cord problem, as opposed to a nerve problem, more likely.  Moreover, the nerve supplying the fifth digit is very rarely symptomatic in people, so involvement of the fifth digit at this point, viewed alongside Jones's December 26 complaints, confirmed that he had a spinal cord problem.

45.     By Jones's March 7, 2008 visit to BOP health services—nearly three months after his initial complaint—the standard of care required not only a thorough history and physical and neurologic exam, but also an MRI.

46.     No such MRI or similar diagnostic test was obtained, however, and the history and examination performed were substandard, falling below the standard of care.  Instead of focusing on Jones's neurological symptoms, Physician Assistant Corbin chose to focus on his hypertension.[3]

47.     The care during the March 7, 2008 visit fell below the standard of care because there was really no assessment of Jones's ongoing and progressive neurologic complaint.  While treating hypertension is appropriate, it was inappropriate and fell below the standard of care not to address the other complaint, particularly given the fact that it then had been present for more than two months and was progressive.

48.     On March 24, 2008, Jones presented to BOP medical staff complaining of back pain and weakness, which also can be symptomatic of a spinal injury.  Jones was given pain and hypertension medication, but the record of this visit does not reflect any

---

[3] Although Jones suffered from hypertension, Drs. Przybylski and Rosencrance testified in no uncertain terms that Jones's neurologic symptoms were unrelated to hypertension.

neurologic testing at all.

49.     On April 6, 2008, Jones submitted an administrative request form explaining that his hands, feet, and legs were numb and "lock up every day" and that "the pain is at the extreme."  The request form indicated prior complaints to the Warden and requested immediate medical attention.

50.     As Dr. Przybylski testified, the complaints in the April 6, 2008 letter showed further progression of Jones's symptoms: "[T]his is the first time that I'm seeing . . . both sides and both upper and lower limbs . . . .  And [Jones's] symptoms at this point in time again demonstrate a progression since the previous month and, because multiple limbs are involved, is consistent with a spinal cord problem."

51.     On April 7, 2008, Jones was again seen by Corbin.  Jones told her he had fallen in the B-2 unit in December, 2007, after which his symptoms "flared."  During this visit, Jones complained of pain in his right arm and left leg, and requested an MRI.  The record of this visit shows that although Jones demonstrated 5/5 (normal) strength, Corbin believed Jones could be suffering from left sciatica (radiating leg pain) and possible right arm paresthesia (numbness or tingling feeling).  Corbin ordered spinal X-rays, establishing her belief Jones was likely suffering from a spinal injury.

52.     By the time of this April 7, 2008 visit, the standard of care required a recognition that this was a progressive complaint referable to the cervical spine and spinal cord which needed to be investigated in a prompt way.  Corbin knew that Jones had a history of such complaints dating back approximately four months, and knew that this was a progressive problem, as she had seen Jones over a one-month period of time where his symptoms went from one limb (the right arm) to two limbs (the right arm and left leg).  The

11

standard of care required a thorough history to get more details about what else might be involved, a neurologic examination that involved a motor examination, sensory examination, and reflex, gait, and coordination examination, and the appropriate diagnostic studies.

53.     By the time of the April 7, 2008 visit, a cervical MRI was necessary.  The standard of care requires that imaging studies are done after conservative management for 8–12 weeks.  An MRI was indicated, as opposed to an X-ray, for persistent pain that had not resolved despite conservative measures.  An MRI would have been required even in the absence of an abnormal full neurologic exam.

54.     Plain X-rays are inadequate to evaluate a spinal injury consistent with Jones's symptoms.  They simply show you what the structure of the bones are like and what the alignment of the spine is like.  An X-ray tells you nothing about the condition of the spinal cord, the nerve roots, or any compression of the spinal cord or nerve roots, which are the likely causes of the symptoms that Jones was describing.  The soft tissues of the spine should have been imaged using an MRI or EMG.

55.     Corbin's decision to order X-rays, instead of an MRI, fell below the standard of care.

56.     The BOP's treatment regarding the X-ray results was also substandard.  The X-ray report came back as "negative, except for degenerative disc disease."  But in reality, the test was not negative.  In fact, it was positive: it diagnosed cervical spondylosis.

57.     Following the X-ray, the standard of care required the cervical MRI that should have been done in the first place.  The X-ray finding was consistent with cervical spondylosis and should have empowered the health care provider to obtain a higher-level

12

imaging study [MRI], because the X-ray was one more piece of evidence that showed that there was a compressive problem going on affecting Jones's nervous system.  The X-ray report's notation of Jones's degenerative disc disease, coupled with the numbness, tingling and the problems that Jones described, warranted an MRI.

58.     Contrary to what the standard of care required, BOP evidently took no action in response to this X-ray, and the record of Jones's visit with Corbin shows the prescription of more medication—a conservative-management measure—now 15 weeks after Jones first presented with these symptoms.

59.     On June 5, 2008—23 weeks after he first experienced neurological symptoms—Jones wrote a letter to Dr. Velasquez, Hazelton's Acting Clinical Director of Medical Services.  He identified severe pain in his back, numbness in his legs, that he could neither sit nor lie down normally, that he had trouble sleeping due to his pain, and that he had trouble walking.[4]   Jones requested an MRI and an appointment with a neurologist.

60.     The complaints in the June 5 letter clearly reflected a spinal cord problem that should have been diagnosed by this point in time.  Even Dr. Wilberger admitted that these symptoms required further investigation, should not have been ignored, and reflected severe cervical myelopathy.  Yet Dr. Velasquez apparently just filed the letter away, and took no action whatsoever.[5]

---

[4] Although some of Jones's June 5 complaints were not medically accurate, Dr. Przybylski explained that Jones was doing the best he could to try to describe where he felt things based on what he'd been told.

[5] *See infra* n.6.

13

61.     The June 5 letter triggered a duty to look back at previous records to see what health care providers had evaluated in terms of history and examinations, note what diagnostic studies had been obtained, and then determine whether Jones's requests to be seen by a specialist with knowledge of the nervous system and to obtain an MRI were reasonable.

62.     On July 10, 2008, Jones presented to BOP medical staff with lower back and left leg pain, and muscle spasms and tenderness in his back.[6]  BOP medical staff saw Jones and noted that his left leg was tight and tender, that he was having back spasms, and that his back was tender.

63.     BOP medical staff failed to obtain a proper medical history or diagnostic imaging studies on July 10, 2008, as the standard of care required.  Instead, BOP medical staff simply prescribed ibuprofen, thus bringing the conservative management of Jones's spinal condition to 27 weeks.

64.     On August 25, 2008, Jones submitted an administrative request form again identifying his back pain, his difficulty walking or moving, and his inability to sleep due to pain.  He asked to see a specialist.  The record reflects no response to Jones's August 25 request.

65.     On October 31, 2008, Jones submitted another administrative request form seeking medical treatment and identifying his medical issues.  In response, the BOP

---

[6] The July 10, 2008 visit refutes the Government's implication at trial that Jones "never went to health services" between May and September 2008.  Not only did Jones write to Hazelton's Acting Clinical Director in June 2008, complaining of an inability to walk and numbness in the hands and legs, Jones did in fact go to health services in July, and submitted requests for medical treatment in August.

scheduled Jones for a doctor's appointment.

66.    On November 3, 2008, Jones saw Dr. Inerio Alarcon and told him about the fall in December 2007.  Dr. Alarcon noted Jones's decreased range of motion, right shoulder pain and lower back pain running down to Jones's left leg and foot.  The record shows that Jones told Dr. Alarcon that he had been experiencing back pain since December 2007.  A partial neurologic exam of Jones's cranial nerve was performed, even though this was not the part of the body that Jones was complaining about.  Dr. Alarcon also performed a straight-leg test, but testified that this was an "old" test that, "now with technology, the MRI and the CT," physicians "don't do[.]"

67.    There is no evidence that Jones's earlier medical records were reviewed, even though the standard of care required such a review.

68.    After indicating that Jones suffered from chronic lumbago (lower back pain), Dr. Alarcon prescribed painkillers.  After 45 weeks of conservative management of Jones's symptoms, Dr. Alarcon recommended an orthopedic consult.

69.    It is undisputed that Jones never received the consult Dr. Alarcon believed was warranted on November 3, 2008.

70.    Instead, on November 5, 2008, Jones was transferred to USP Tucson in Arizona.

71.    On November 4, 2008, as part of the transfer, USP Hazelton's medical staff prepared a health summary report.  The report noted that Jones had lumbago (back pain) and was receiving pain medication.  Yet, despite listing some of Jones's upcoming medical appointments, the report did not include any mention of the orthopedic consult, and made no effort to reschedule it.

72.     It fell below the standard of care for the BOP to fail to provide Jones with the specialist consult that its medical professional had recommended.

73.     If Jones had received timely and proper treatment while at USP Hazelton between December 26, 2007, and November 4, 2008, he likely would have made a full recovery.

74.     Jones arrived at USP Tucson on November 7, 2008, and received a health intake screening.  BOP medical staff noted that he was taking daily prescription pain medication ("Indocin") for his lumbago and renewed his prescription.  The document's notation that "[c]urrent painful condition is denied" is internally inconsistent with its statement that Jones was receiving pain medication.  Further, Jones testified—consistent with the renewal of his prescription painkillers—that he told the person handling intake at USP Tucson that he had a spinal injury.  The orthopedic consult request is not mentioned and no review of Jones's prior medical files is indicated.

75.     Jones was in considerable pain and was deteriorating while at USP Hazelton.  Yet early medical examinations at USP Tucson indicate that his spinal condition was still in its earlier stages.  Brisk reflexes had not yet fully developed, but they would be noted after his March, 2009 collapse in the recreation yard.

76.     On November 14, 2008, Jones complained to BOP staff that he was having trouble walking, and noted that an earlier request for a wheelchair had been denied.

77.     On November 24, 2008, Jones presented to BOP medical staff with left sciatica, left knee pain, and right arm numbness and weakness that had existed for about a year.  BOP medical staff observed that although Jones had normal reflexes, he exhibited "2/4" muscle-strength weakness in his right upper extremity, and walked with a limp—*i.e.*,

16

he had an impaired gait.  These are symptoms of neurologic injury.  Dr. Wilberger admitted as much by describing another patient exhibiting "weak grips," and experienced gait impairment, fatigue, and insomnia as having "significant signs of myelopathy."

78.     The standard of care during the November 24, 2008 visit required the BOP to attempt to identify the etiology of Jones's condition by asking questions and reviewing his medical records.  It also required a complete neurological examination.

79.     The care during the November 24, 2008 visit fell below the standard of care, and the physical and neurologic exam performed at this appointment was incomplete and substandard.

80.     At the November 24, 2008 visit, with Jones's condition entering its 47th week, BOP medical staff again recommended referring Jones for a specialist consult, designated as "routine."

81.     This referral was not sufficient, as Jones needed to have an imaging study and a fairly immediate referral at that point to a neurologist or a neurosurgeon for a delineation of what was going on—particularly given the long-standing nature of his complaints.

82.     Although BOP medical staff recommended that Jones see a specialist, BOP had not even scheduled that consult as of February 27, 2009.  In fact, Jones never received this consult.  Once again, Jones's treatment fell below the standard of care.

83.     On December 14, 2008, Jones presented to BOP medical staff with pain in his back radiating down his left leg, and numbness.  A limited musculoskeletal exam revealed his limited range of motion and tenderness.  The BOP's response was to prescribe an even more potent painkiller that would do nothing to treat Jones's spine.

17

84.     The standard of care at this appointment required a thorough history and an adequate and thorough neurologic exam.  Further, Jones should have had imaging studies done at this visit.  The standard of care requires that those are done after conservative management for eight to 12 weeks.

85.     At this point, a cursory review of nearly a year's worth of medical records would have revealed that Jones had been suffering for over 50 weeks with these symptoms.  Yet no MRI or CT was performed, no specialist consult was held, and the conservative management continued.  The failure to obtain a discernible medical history, to perform a neurologic exam, or to order proper imaging studies at this appointment fell below the standard of care.

86.     Between December 2008 and January 2009, Jones submitted two administrative remedy request forms that described his back pain, numbness, and burning sensation in his hands and feet.  He also described difficulty in sitting or moving normally, as well as trouble walking.  Jones noted further that his symptoms dated back a year.

87.     The BOP responded that Jones had been approved for the outside consult following his appointment in late November 2008, but that BOP had not yet scheduled it.  Once again, it is undisputed that the consult never took place.

88.     On February 12, 2009, Jones saw BOP medical staff at Tucson and told them that he had been experiencing numbness in his left arm for 14 months.  Numbness is a neurologic symptom.  Jones was given only medicine for hypertension.

89.     Each of BOP medical staff's failures—to take a full history, perform a full neurologic exam, obtain an MRI or refer Jones to a neurologist or neurosurgeon—fell below the standard of care.  Simply addressing Jones's hypertension, without more, likewise fell

18

below the standard of care.

90.     On March 11, 2009, Jones was trying to walk in the USP Tucson prison yard when he felt a "lightning bolt come up from the bottom of [his] back all the way up [his] neck."  He collapsed to the ground, unable to move and having trouble breathing.

91.     Jones was then taken to a local hospital.  Based on a full medical history, physical and neurological examinations, and imaging including MRI and CT scans, a neurosurgeon determined that Jones suffered from severe cervical myelopathy with possibly irreversible spinal cord damage.  The neurosurgeon also noted muscle wasting in Jones's hands.

92.     Dr. Przybylski testified that "probably the most compelling physical examination evidence that this was a long-standing problem was the description of the wasting of [Jones's] interossei muscles bilaterally . . . .  That is something that takes a fairly long time to occur.  That would be measured in months to years," "so the simple fact that muscle wasting is seen within the hands on both sides tells us that myelopathy has been present for many months preceding this exam."

93.     At trial Dr. Wilberger presented a theory of an "acute event" occurring on March 11, 2009, and his report stated that "there is no indication whatsoever that Mr. Jones was suffering any progressive myelopathy between December 2007 and March 2009."  But Dr. Wilberger admitted that if he saw evidence of muscle wasting in the hands, cervical myelopathy "would have progressed already," and that it would have existed for some time prior to the observation of muscle wasting.  Dr. Wilberger evidently overlooked that evidence of muscle wasting in rendering his opinions.  Moreover, Dr. Przybylski testified that there were other signs, such as spondylosis (a bony compression), which "tells

19

us that condition has been around for some time." In addition, he testified that there was evidence of "brisk reflexes," which "typically take[] time to develop," and thus typically do not exist in acute injury situations.

94.     In March 2009, Jones underwent laminectomy surgery (removal of some vertebral bone to widen the spinal canal). Laminectomy serves to relieve spinal cord compression; it does not treat neck pain. That Jones went from being unable to walk before his surgery to being able to walk during his rehabilitation period shows that the surgery was successful.

95.     As Dr. Rosencrance testified, "this is one of the most clear-cut cases of negligence that I've actually seen in the last 25 years." Dr. Przybylski likewise found no ambiguity in the evidence establishing that the standard of care was not followed in this case.

96.     Since his emergency laminectomy surgery in March 2009, Jones continues to experience pain in his back, neck, arms, legs, hands, and feet, muscle atrophy, muscle stiffness, weakness, and neurological deficits such as numbness, tingling, and burning sensations.

97.     Jones requires a walker to walk and has difficulty with his balance.

98.     Symptoms and deficits like these, which Jones continues to experience 18–24 months following his surgery, are permanent.

99.     Although Jones eventually received the "maximum benefit" from physical therapy following his surgery, that therapy was unable to overcome his now-permanent disability. Indeed, early physical therapy is really primarily focused upon accommodating the nervous system deficits so that you can perform activities of daily living, not on

20

recovery.  Consequently, any missed appointments not only did not have an impact on how soon Jones would get better, but also did not have an impact on the extent to which he would get better.

100.   Nor did Jones's May 2013 cervical fusion surgery change the permanency of his condition.  In fact, in five to ten years, Jones will likely require further treatment for adjacent-level disease or progression of arthritis at levels that were not fused that can become symptomatic.

101.   Jones will experience a further decline in function, most likely around his mid-50s.

102.   Jones is a 41-year-old black male.  Based on the vital statistics reports published by the Centers for Disease Control, Jones has a life expectancy of 74 years of age, or 33.3 more years.  His current life expectancy is not expected to be reduced from his spinal injury.

103.   Jones is scheduled to be released from prison on July 19, 2015, when he will be 43 years old.

104.   Jones will need lifelong medical attention, spinal treatments, and ongoing medical evaluation by a neurologist, physiatrist, and/or spine surgeon.  During trial, Ms. Bond, a qualified life-care planner, conservatively calculated, based on the present median cost of physiatry services and pain management, that these services will cost Jones $1,708.10 annually.

105.   Jones will also need lifelong medication to manage: daily nerve pain (gabapentin, acetaminophen with codeine); exacerbations of pain (acetaminophen); and additional pain at night (Elavil).  During trial, Bond calculated that these medications, which

Jones has already been prescribed, will cost Jones $4,915.34 annually.

106.    Jones will also need rehabilitative physical therapy to help manage pain and avert further disability.  During trial, Bond conservatively calculated that this service will cost Jones $2,400 annually.

107.    Jones will also need certain medical and therapeutic equipment.  He currently has access to several adaptive devices—*i.e.*, a rolling walker, shower chair, and mattress overlay—which he will continue to need.  In the future, he will require additional equipment, including a wheelchair, motorized scooter, and home adaptations.  During trial, Bond calculated that this equipment will cost Jones $483.37 annually before age 55, and $1,433.21 each year thereafter.

108.    Jones will continue to be impaired in physical tasks, such as those requiring balance, climbing, repeated reaching or lifting, prolonged sitting, prolonged walking, and fine hand dexterity.  Consequently, he will require assistance with tasks such as heavy cleaning, lifting, and interior maintenance.  As he ages, his need for such assistance will increase.  During trial, Bond conservatively calculated that these additional services and assistance will cost Jones $1,357.56 annually before age 55, and $2,564.28 each year thereafter.

109.    In the aggregate, these future medical expenses total $405,583.04 over Jones's lifetime.

110.    Mr. Jones has rarely, if ever, held steady employment.  In addition, the fact that he must register as a sex offender and disclose that he has been convicted of first degree sexual abuse militates against his being able to obtain employment, as do his convictions for theft, car theft, narcotics violations, and assault.

22

**Conclusions of Law**

1.      Generally, the United States is immune from suit except as it consents to be sued.  A suit against the Government cannot proceed absent a waiver of sovereign immunity.  The Federal Tort Claims Act provides a judicial remedy to those who suffer injury or damages as the result of the negligence of employees of the federal agencies of the United States government.  It permits recovery on claims for money damages "for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. §§ 1346(b), 2671–2680; *Bellomy v. United States*, 888 F. Supp. 760 (S.D. W.Va. 1995) (Haden, C.J.).

2.      The Federal Tort Claims Act is a limited waiver of the sovereign immunity of the United States; it exposes the federal government to liability for certain torts committed by federal employees acting within the scope of their employment.  28 U.S.C. § 2674; *United States v. Orleans*, 425 U.S. 807, 814 (1976).

3.      The FTCA's waiver of immunity, however, is not absolute; Congress excepted several important classes of tort claims from its purview, including "[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . , whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

4.      The exception is designed to "prevent judicial 'second-guessing' of . . .

23

administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  ***United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)***, 467 U.S. 797, 814 (1984).

4.     In other words, the exception insulates the government from liability only if the challenged action involves a permissible exercise of policy judgment.  ***Berkovitz v. United States***, 486 U.S. 531, 537 (1988).

5.     A two-pronged test governs application of the exception.  First, the court must determine whether the government action at issue "involves an element of judgment or choice."  ***Id.*** at 536.  A government employee's conduct cannot involve judgment or choice where a federal statute, regulation, or policy specifically prescribes a course of action; in that situation, the employee has "no rightful option but to adhere to the directive," and if the plaintiff can show that the employee failed to do so, the discretionary function exception does not apply.  ***Baum v. United States***, 986 F.2d 716, 720 (4th Cir. 1993) (citing ***Berkovitz***, 486 U.S. at 536).

6.     If an element of judgment or choice is present, however, the court must then decide whether the discretion given to the government actor is of the type the exception is designed to shield—that is, discretion grounded in considerations of public policy.  ***United States v. Gaubert***, 499 U.S. 315, 322–23 (1991).  This means that certain "obviously discretionary acts" will fall *outside* the discretionary function exception, where the discretion given is not "based on the purposes that the regulatory regime seeks to accomplish."  ***Id.*** at 325 & n.7.

7.     If the discretionary function exception applies, the United States retains its

24

sovereign immunity and this Court lacks subject matter jurisdiction over the excepted claim.

8.     If resolution of the jurisdictional question is bound up with resolution of the merits, however, the proper course is for the district court to assume jurisdiction and assess the merits of the claim.  ***Kerns v. United States***, 585 F.3d 187, 195 & n.6 (4th Cir. 2009); ***United States ex rel. Vuyyuru v. Jadhav***, 555 F.3d 337, 348 (4th Cir. 2009) (quoting ***Adams v. Bain***, 697 F.2d 1213 (4th Cir. 1982)).

9.     The plaintiff relies upon paragraph 10.b. of the BOP's Standards of Employee Conduct Program Statement.  Paragraph 10.b. provides as follows:

> Because failure to respond to an emergency may jeopardize the security of the institution, as well as the lives of staff or inmates, it is mandatory that employees respond immediately and effectively to all emergency situations.

10.     In its Order Denying Plaintiff's Motion for Summary Judgment and Denying Defendant's Motion to Dismiss and Motion for Summary Judgment [Doc. 144], this Court held that the plaintiff should be afforded the opportunity to prove that USP Hazelton officials did not respond immediately to the so-called warning note found by Ms. Shorter.  This Court further held that the plaintiff should be afforded the opportunity to prove that USP Hazelton officials did not respond effectively to the warning note.  Stated succinctly, the plaintiff is charged with proving that the BOP breached the duty to respond immediately and effectively.

11.     The word "immediately" is not defined in paragraph 10.b.  The Court finds that the meaning of "immediately" is unambiguous.  This Court will construe the term "immediately" as meaning "without delay."

12.     At trial, Anndreea Shorter testified that she found the warning note at the door

to the B-1 housing unit at approximately 3:41 p.m.  Ms. Shorter read the note as soon as she found it.  Ms. Shorter testified that she considered the warning note to be "very important" and "something you would act on right away."

13.    According to Ms. Shorter, she returned to her office immediately after finding and reading the warning note and called the SIS office for the express purpose of reporting the information in the note.  Ms. Shorter's call to the SIS office was not answered, so she took direct steps to identify a telephone extension where she could reach an SIS officer. Ms. Shorter testified that she wasted no time in calling the extension provided, spoke with an SIS officer, explained that she found the warning note, and read the note to him.

14.    According to Ms. Shorter, the SIS officer to whom she spoke directed her to hand-carry the warning note to the USP Hazelton SIS office.  Ms. Shorter testified that she left her office as soon as the telephone conversation with the SIS officer concluded and began walking the warning note to the SIS office, without delay or detour.  Before Ms. Shorter could reach the SIS office, and within minutes of finding the warning note, Ms. Shorter heard a body alarm and was notified by radio that the fight in the B-2 housing unit had already commenced.

15.    There can be no question that Ms. Shorter acted immediately after she found the warning note outside the door to the B-1 housing unit.  The plaintiff did not offer any evidence that Ms. Shorter was dilatory in reacting to the information in the warning note.

16.    Of course, the plaintiff contends that Ms. Shorter's actions were not appropriate or effective.  However, claiming that a person's actions are not appropriate or effective is not the equivalent of claiming that the actions were not taken immediately.  The plaintiff bears the burden of proving that Ms. Shorter's actions were not immediate.  He has

26

failed to do so.

17.     Similarly, the plaintiff has failed to prove that any other USP Hazelton employee did not act immediately.  Ms. Shorter testified that she was able to reach an unidentified SIS officer almost immediately after discovering the warning note.  Ms. Shorter's initial call to the SIS office was not answered.  When she radioed the appropriate personnel to obtain an extension where she might be able to reach an SIS officer, the information was provided to her immediately.  According to Ms. Shorter, she called the extension and was able to speak with an SIS officer without delay.  The SIS officer instructed Ms. Shorter to leave her office and bring the warning note to the SIS office.

18.     Once again, the plaintiff may contend that the SIS officer's decision to have Ms. Shorter bring the note to the SIS office was not effective or reasonable under the circumstances.  Even if one accepts this as true, *arguendo*, it does not establish that the unidentified SIS officer did not act immediately.  In fact, the SIS officer took immediate action by directing a BOP staff member to bring him the only available evidence regarding the warning note.

19.     The plaintiff's burden to prove that the USP Hazelton employees did not respond "effectively" to the warning note is a decidedly heavier and more difficult burden. The plaintiff has not identified any statute, regulation or BOP policy which delineates what constitutes an "effective" response to an emergency situation.  In other words, available sources of information do not offer any guidance on what comprises an effective response to a generic emergency or the particular facts of this case.

20.     Two experienced correctional officers, William Holzapfel and Hiromichi Kobayashi, testified that the manner in which USP Hazelton employees responded to the

warning note was entirely appropriate.   Mr. Holzapfel testified that he has been a correctional officer for 17 years.  He also testified that there is nothing in BOP regulations or policy that directs or mandates how a BOP employee is to respond to or address a warning note such as the one at issue in this case.

21.      Furthermore, Mr. Holzapfel testified that it was entirely reasonable for the SIS officer who took the call from Ms. Shorter, to direct her to bring the note to the SIS office for investigation and further action.  Mr. Holzapfel further clarified that the information in the note had to be investigated before anyone could take definitive action.  According to Holzapfel, an investigation of such a note is necessary because there is a significant possibility that the information in the note is false, inaccurate, or misleading.

22.      Mr. Holzapfel testified that there are many times when warning notes or other allegations made by inmates give rise to a concern that the information is an effort at misdirection, so that prison resources will be deployed in one direction while a security threat is actually aimed in another direction.

24.      Similarly, Mr. Kobayashi testified that he has been a correctional officer for 12 years.  Kobayashi also testified that there is nothing in BOP regulations or policy that specifies or mandates how a BOP employee is to respond to or address a warning note such as the one at issue here.

25.      He also testified that it was reasonable and appropriate for the SIS officer who took Ms. Shorter's call to direct her to bring the note to the SIS office for further investigation.  Like Mr. Holzapfel, Mr. Kobayashi testified that the information in a note, like the one in this case, has to be investigated before anyone can take definitive action, because there is a possibility that the information in the note is false, inaccurate, or

28

misleading.   Mr. Kobayashi testified that there are times when warning notes or other allegations made by inmates contain information intended as misdirection, so that prison resources will be deployed in one direction while a security threat is actually aimed elsewhere.

25.    In addition, the officers did not know exactly where Mr. Evans was at the time. At the 4:00 count, in contrast, they would know exactly where Mr. Evans was, enabling the SIS to bring him in for questioning.

26.    With respect to Ms. Shorter's response to the warning note, there is no evidence that it was not effective.   During the trial, that plaintiff seemed to suggest that she should have gone to the B-2 housing unit with the note instead of calling the SIS office. However, there is no evidence that this would have been a better or more effective response.   In fact, Ms. Shorter testified that if she had taken the warning note to someone else, he/she would have found it necessary to direct the note to the SIS office. The warning note had to be taken to the SIS office because SIS had to investigate and verify the information therein.   Consequently, calling SIS was the quickest way to address the potential threat.

27.    Finally, it cannot be overlooked that the note itself directed Ms. Shorter to "give this to SIS or the LT ASAP."   Even the author of the note seems aware that the note would have to be investigated by the SIS.

28.    The evidence shows that there was not a mandated non-discretionary way to deal with the warning note.   More importantly, the evidence reveals that the actions taken in this case were both appropriate and reasonable.   In addition, plaintiff did not demonstrate that the actions of Ms. Shorter and the SIS officer were careless, inattentive

or lazy.

29.     Even if one thinks they could have handled things differently, they were not thoughtless or languid with regard to the note.  The evidence shows that USP Hazelton employees responded immediately and as effectively as possible to the information in the warning note.

30.     One must also consider the brief amount of time between the receipt of the note and the attack itself.  It appears that the time period was simply too short for BOP personnel to thwart the attack.

31.     A number of cases from other jurisdictions support the discretionary aspect of the situation presented by the facts of this case.  In *Calderon v. United States*, 123 F.3d 947 (7th Cir. 1997), the Seventh Circuit held that the discretionary function exception to the FTCA precluded recovery in an inmate-on-inmate assault case, where the plaintiff had earlier informed the BOP employees about pre-assault threats and the BOP employees took no steps to protect the plaintiff or discipline the inmate.  The Circuit rejected reliance on 18 U.S.C. § 4042, noting that "[w]hile it is true that this statute sets forth a mandatory duty of care, it does not, however, direct the manner by which the BOP must fulfill this duty. The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates."  123 F.3d at 950.

32.     In *Cohen v. United States*, 151 F.3d 1338 (11th Cir. 1998), the Eleventh Circuit considered a case of a prisoner-on-prisoner attack.  The plaintiff alleged that the BOP had negligently assigned the attacker to a minimum security prison, relying on 18 U.S.C. § 4042.  The Eleventh Circuit held that "even if § 4042 imposes on the BOP a

30

general duty of care to safeguard prisoners, the BOP retains sufficient discretion in the means it may use to fulfill that duty to trigger the discretionary function exception."  151 F.3d at 1342.

33.   The **Cohen** Court further stated that

[t]he Seventh Circuit's reasoning in **Calderon** also convinces us that § 4042 leaves BOP personnel sufficient discretion about how their § 4042 duty of care is to be accomplished to warrant application of the discretionary function exception.  **Calderon** rejected the argument that the general duty to protect prisoners set forth in § 4042 prevents the Government from invoking the discretionary function exception in an FTCA case arising from a prisoner-on-prisoner attack.  The Seventh Circuit reasoned persuasively that "[w]hile it is true that [§ 4042] sets forth a mandatory duty of care, it does not, however, direct the manner by which the BOP must fulfill this duty.  The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates."  **Calderon**, 123 F.3d at 950.  We agree.

151 F.3d at 1342–43.

34.   In **Buchanan v. United States**, 915 F.2d 969 (5th Cir. 1990), the Fifth Circuit found that the discretionary function exception shielded the Government from liability, where American prisoners were taken hostage by Cuban nationals in the prison, noting that "'a prison's internal security is peculiarly a matter normally left to the *discretion* of prison administrators.'  **Rhodes v. Chapman**, 452 U.S. 337, 349 n.14 (emphasis added). When the potential for violence ripens into actual unrest and conflict, this principle carries special weight.  *See* **Whitley v. Albers**, 475 U.S. 312, 321 (1986)."  915 F.2d at 971.

35.   The **Buchanan** Court added "'Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'  **Bell v. Wolfish**, 441 U.S. 520, 547 (1979).  That deference 'requires that neither

judge nor jury freely substitute their judgment for that of officials who have made a considered choice.'  **Whitley**, 475 U.S. at 322."  915 F.2d at 972.

36.    In **Santana-Rosa v. United States**, 335 F.3d 39, 43 (1st Cir. 2003), the First Circuit considered another case of prisoner-on-prisoner violence.  The Court found that the action was barred by the discretionary function exception, noting that "[t]o demonstrate that its conduct was discretionary, the Government need only show that there was 'room for choice' in making the allegedly actionable decision or decisions," quoting **Attallah v. United States**, 955 F.2d 776, 783 (1st Cir. 1992).

37.    The First Circuit in **Santana-Rosa** also held that

> [t]he management of large numbers of potentially dangerous individuals within a penal facility inevitably requires not only the exercise of discretion but decision-making within the context of various difficult policy choices.  In many, if not most, instances where an inmate is unfortunately injured by another inmate, it will be possible to argue that a different exercise of discretion or a different policy choice might well have forestalled the injury. Nevertheless, decisions with regard to classification of prisoners, assignment to particular institutions or units, and allocation of guards and other correctional staff must be viewed as falling within the discretionary function exception to the FTCA, if penal institutions are to have the flexibility to operate.  In this case, as in **Cohen** and **Calderon**, the facts viewed in the light most favorable to the plaintiff 'exemplif[y] the type of case Congress must have had in mind when it enacted the discretionary function exception.'

335 F.3d at 44.

38.    In **Montez ex rel. Estate of Hearlson v. United States**, 359 F.3d 392 (6th Cir. 2004), the Sixth Circuit applied the discretionary function exception and rejected an action brought on behalf of an inmate murdered by another inmate.  As in the cases above, the court rejected reliance on 18 U.S.C. § 4042, stating:

> The statute imposes a mandatory duty upon the Bureau of Prisons (BOP) through the use of the word "shall."  **Calderon v. United States**, 123 F.3d

32

947, 950 (7th Cir. 1997) (holding that § 4042(a) "sets forth a mandatory duty of care").  But the duty imposed by § 4042(a) is of a general nature, broadly requiring that the BOP "provide for the safekeeping" and "provide for the protection" of federal inmates.  BOP officials are given no guidance, and thus have discretion, in deciding how to accomplish these objectives.

The two other circuits that have previously considered this issue have both decided that § 4042(a) does not specifically prescribe a course of action for prison officials to follow.  *See Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998) ("[E]ven if § 4042 imposes on the BOP a general duty of care to safeguard prisoners, the BOP retains sufficient discretion in the means it may use to fulfill that duty to trigger the discretionary function exception."); *Calderon*, 123 F.3d at 950 ("While it is true that this statute sets forth a mandatory duty of care, it does not, however, direct the manner by which the BOP must fulfill this duty.  The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates.").  We believe that *Cohen* and *Calderon* are persuasive on this point, and we therefore adopt their conclusion.

359 F.3d at 396.

39.     Paragraph 10.b. of the BOP's Standards of Employee Conduct Program Statement is similar.  The provision requires that the BOP act immediately and effectively, but provides no guidance as to how the BOP staff is to meet those goals.

40.     Having now heard the testimony of all the witnesses and having found that the BOP staff acted immediately, it is this Court's conclusion that the discretionary function exception applies, depriving this Court of jurisdiction to consider Count I of the plaintiff's Amended Complaint.

41.     In the event that it is too late to apply the discretionary function exception, this Court also finds that the plaintiff has failed to meet his burden of demonstrating that the BOP staff failed to act immediately or effectively in attempting to prevent the attack upon the plaintiff.

42.     Accordingly, Count I is dismissed with prejudice.

43.    With respect to Counts II and III, the medical malpractice counts, the government's liability under the FTCA is determined by applying the law of the state where the alleged tort occurred.  28 U.S.C. § 1346(b)(1).

44.    Count II and Count III of plaintiff's complaint allege that Bureau of Prisons officials in West Virginia and Arizona, respectively, were medically negligent in their treatment of plaintiff.  This Court must therefore apply West Virginia and Arizona law in adjudicating plaintiff's claims.

45.    As described below, the applicable statutes and case law of both states are functionally identical, and will be treated as such unless otherwise noted.

46.    To successfully raise a medical malpractice claim, the plaintiff must establish the familiar elements common to all claims of negligence: duty, breach, causation, and damages.

47.    Mapped onto the medical environment, this means that the plaintiff must prove, by a preponderance of the evidence, (1) the applicable medical standard of care; (2) that, in treating the plaintiff, the defendant failed to meet that standard of care; and (3) that the defendant's negligence was a proximate cause of plaintiff's injury.  W.Va. Code § 55-7B-3(a)(1)–(2); A.R.S. § 12-563; *Bellomy,* 888 F. Supp. at 764 (applying West Virginia law); *Seisinger v. Siebel*, 220 Ariz. 85, 94, 95, 203 P.3d 483, 492, 493 (2009) (en banc).

48.    The applicable standard of care and the defendant's failure to meet it must ordinarily be proven by expert testimony.  W.Va. Code § 55-7B-7; *Estate of Fout-Iser ex rel. Fout-Iser v. Hahn*, 220 W.Va. 673, 676–77, 649 S.E.2d 246, 249–250 (2007) (citing

*Roberts v. Gale*, 149 W.Va. 166, 139 S.E.2d 272 (1964)); *Seisinger*, 220 Ariz. at 94, 203 P.3d at 492.

49.    A proximate cause is one "which in actual sequence, unbroken by any independent cause, produced the wrong complained of, without which the wrong would not have occurred." *Mays v. Chang*, 213 W. Va. 220, 224, 579 S.E.2d 561 (W. Va. 2003) (citing *Webb v. Sessler*, 135 W. Va. 341, 63 S.E.2d 65 (1950)).  The plaintiff need only show that defendant's failure to meet the standard of care was *a* proximate cause of plaintiff's injury, not the *sole* proximate cause.  *Id.*  Expert testimony is normally required to establish proximate cause in medical negligence cases, but where a causal relationship is readily apparent to the trier of fact, proximate cause may be inferred.  *Sexton v. Grieco*, 216 W.Va. 714, 719–20, 613 S.E.2d 81 (2005); *Pruitt v. Zeiger*, 590 So.2d 236, 237–38 (Ala. 1991).

50.    The United States does not dispute that it owed plaintiff a duty, or that plaintiff has suffered an injury; breach of duty and causation are the only elements of plaintiff's medical negligence claims the parties have placed in issue.

51.    This Court finds the testimony of Drs. Rosencrance and Przybylski to be more credible, persuasive and useful than that of the other testifying physicians, particularly with respect to their testimony concerning the standard of care and the breaches thereof.

52.    Both Drs. Rosencrance and Przybylski testified that the medical personnel at USP Hazelton and USP Tucson repeatedly breached the standard of care, causing permanent injury to the plaintiff.  This Court agrees.

53.    Had the plaintiff received appropriate treatment and care, the plaintiff would

have recovered.  Due to the failure to provide appropriate care and treatment, the plaintiff

has suffered permanent, debilitating injuries.

54.     Accordingly, the plaintiff prevails on both Counts II and III.

55.     This Court will award the plaintiff the sum recommended by his life planner

for future medical costs and therapeutic equipment in the amount of $405,583.04.

56.     Due to the lack of a significant employment history and the plaintiff's criminal

history, this Court finds that any award for lost wages would be speculative.  Accordingly,

no lost wage award will be made.

57.     With regard to non-economic damages, such as pain and suffering and the

loss of the ability to enjoy life:

> It is well settled that an injured plaintiff may recover damages for pain and
> suffering caused by the negligence of the defendant.  **Keiffer v. Queen**, 155
> W.Va. 868, 189 S.E.2d 842 (1972).  In addition, "[a] plaintiff may recover the
> cost of reasonable and necessary future medical and hospital services and
> for future pain and suffering when the evidence shows it is reasonably certain
> that such future expenses will be incurred and are proximately related to the
> negligence of the defendant."  Syllabus Point 1, **Ellard v. Harvey**, 159 W.Va.
> 871, 231 S.E.2d 339 (1976).  *See also* **Keiffer v. Queen**, *supra;* **Hall v.
> Groves**, 151 W.Va. 449, 153 S.E.2d 165 (1967); **Shreve v. Faris**, 144 W.Va.
> 819, 111 S.E.2d 169 (1959).

**Delong v. Kermit Lumber & Pressure Treating Co.**, 175 W.Va. 243, 244–45, 332 S.E.2d

256, 257 (1985).

58.     In an action for personal injuries, the damages are unliquidated and

indeterminate in character, and the assessment of such damages is the peculiar and

exclusive province of the jury.  Syl. Pt. 6, **Crum v. Ward**, 146 W.Va. 421, 122 S.E.2d 18

(1961) (quoting Syl. Pt. 3, **Yuncke v. Welker**, 128 W.Va. 299, 36 S.E.2d 411 (1945)).

59.     The Fourth Circuit has recognized that

"[t]he trial court, as a fact-finder, possesses considerable discretion in fixing damages, and its decision will be upheld absent clear error." **Little Beaver Enters. v. Humphreys Rys.**, 719 F.2d 75, 79 (4th Cir. 1983); *see also* **United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.**, 86 F.3d 332 (4th Cir. 1996) ("The calculation of damages is a finding of fact and therefore is reviewable only for clear error, but to the extent those calculations were influenced by legal error, review is *de novo*."); **Scott v. Vandiver**, 476 F.2d 238, 243 (4th Cir. 1973) ("Ascertainment of damages arising from personal injuries involves questions that are essentially factual, and an award by a district judge will not be upset unless it is clearly erroneous."). "A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed." **Front Royal v. Town of Front Royal**, 135 F.3d 275, 284 (4th Cir. 1998) (quoting **Faulconer v. Commissioner**, 748 F.2d 890, 895 (4th Cir. 1984)); *see* Fed. R. Civ. P. 52(a) ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses").

**Park v. Shiflett**, 250 F.3d 843, 855 (4th Cir. 2001) (Traxler, J., concurring in part and dissenting in part).

60.     This Court finds that the plaintiff has suffered pain and suffering from the time of his injury, which remained untreated until his collapse in 2009, and will continue having back pain throughout the remainder of his life, expected to be 33 years.  In addition, the plaintiff has been reduced from an active person to a person who is incapacitated for the remainder of his life.  Accordingly, this Court will award non-economic damages of $250,000 on Count II and $250,000 on Count III.

The Clerk is directed to enter judgment in favor of the plaintiff in the amount of $905,583.04.

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this Order to counsel of record herein.

**DATED**: April 7, 2014.

JOHN PRESTON BAILEY
CHIEF UNITED STATES DISTRICT JUDGE